UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| HYPERCUBE LLC, ET AL.,    ) | |
| ) | |
|    Plaintiffs,    ) | |
| ) | CIVIL ACTION NO. |
| VS.    ) | |
| ) | 3:08-CV-2298-G |
| COMTEL TELCOM ASSETS LP d/b/a    ) | |
| EXCEL TELECOMMUNICATIONS,    ) | **ECF** |
| INC.,    ) | |
| ) | |
|    Defendant.    ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the motion of the defendant, Comtel Telecom Assets LP d/b/a Excel Telecommunications ("Excel" or "the defendant"), for partial judgment on the pleadings. For the reasons discussed below, the motion is granted in part and denied in part.

### I. BACKGROUND

Excel is a long distance telephone company. Excel's Motion for Partial Judgment on the Pleadings and Brief in Support ("Motion") at 2. More specifically, Excel is an interexchange carrier ("IXC"), which means that Excel does not provide

local telephone service. *Id.* Rather, Excel pays local telephone companies, known as local exchange carriers or LECs, to connect customers into Excel's network. *Id.* In other words, Excel pays a fee to an LEC that connects a call from the caller's local network into Excel's more extensive long-distance network. *Id.* On the terminating end of the call, Excel pays a fee to a different LEC to connect the call to the call recipient. *Id.* Typically, there are four LECs involved in one long-distance call. On the originating end of the call, there is usually a small, local LEC, which transfers calls to a larger LEC, which then transfers the call to an IXC like Excel. *Id.* The same process takes place in reverse on the terminating end of the call. *Id.* IXCs like Excel pay a large fee to the small, local LEC, and a small fee to the larger LEC. *Id.* at 2-3.

Wireless carriers, however, are specifically excluded from the definition of LECs. 47 U.S.C. § 153(26). In fact, the Federal Communications Commission ("FCC") "prohibits wireless carriers from imposing access charges on IXCs, even though they originate calls much like LECs, based on a policy decision that recognizes that wireless carriers are subject to very little regulation and have other offsetting advantages." Motion at 3 (citing *In re Sprint PCS*, 17 F.C.C.Rcd. 13192, ¶¶ 8-9, 12 (2002)). Thus, an IXC like Excel pays no fee to a wireless carrier. *Id.* Usually, however, a wireless carrier transfers calls to an LEC, who then delivers the calls to the IXC. *Id.* The IXC still pays a fee to the LEC, but not to the wireless carrier. *Id.* at 3-4.

The plaintiffs, Hypercube LLC and Hypercube Telecom, LLC (collectively, "Hypercube" or "the plaintiffs"), claim to be LECs.  Plaintiffs' Response Brief in Opposition to Defendant's Motion for Judgment on the Pleadings ("Response") at 3; Motion at 4.  According to the defendants, Hypercube asks wireless companies to send it calls, and Hypercube then sends those calls to a second LEC, which then transfers the call to Excel.  Motion at 3.  Hypercube is not a wireless carrier and therefore charges Excel for its services.  *Id*. at 3-4.  Hypercube shares its fees from Excel with the wireless company, however, to induce the wireless company to continue sending Hypercube calls.  *Id.* at 4.   Excel argues that this practice is an end-around of the FCC's prohibition against wireless carriers receiving fees from IXCs like Excel.  *Id.*  The defendants also argue that Hypercube has inserted itself into the call-chain unnecessarily and provides no additional service to anyone.  *Id.* at 3-4.  Excel asserts that it inadvertently paid a number of Hypercube's invoices "before realizing what Hypercube was up to."  *Id.* at 4.  Excel then informed Hypercube that it no longer required its services.  *Id.* at 4-5.  Hypercube, however, continues to receive calls from wireless carriers and then direct those calls to Excel, charging Excel for this service.  *Id.* at 5.  Excel claims it is "powerless to block traffic from Hypercube because Hypercube routes the calls through the [LECs], thus intermingling Hypercube calls with other legitimate traffic."  *Id.*

Hypercube has asserted claims for breach of Hypercube's federal tariff, quantum meruit, and also seeks a declaratory judgment that it is lawfully charging Excel for its services and that Excel must pay for any services Hypercube has provided. Complaint ¶¶ 31-52. Excel, in its motion for partial judgment on the pleadings, argues that the court should enter judgment in favor of the defendant on the breach of tariff claim and the declaratory judgment claim. Motion at 1. Excel argues that Hypercube's breach of tariff claim must fail because Hypercube has no tariff. Motion at 6. Excel contends that the federal tariff Hypercube claims to be a party to actually does not include Hypercube. *Id.* at 7. Further, Excel argues, the declaratory judgment action must fail because Excel has no obligation to purchase Excel's services. *Id.* at 10.

## II.  ANALYSIS

### A.  Legal Standard

"After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). When ruling on such a motion, the court must regard allegations of fact in the complaint as true. See *Cash v. Commissioner of Internal Revenue*, 580 F.2d 152, 154 (5th Cir. 1978). The court may enter judgment on the pleadings only if the material facts show that the movant is entitled to prevail as a matter of law. See *Greenberg v. General Mills Fun Group, Inc.*, 478 F.2d 254, 256 (5th Cir. 1973). This standard is roughly equivalent

to that applied on a motion under Rule 12(b)(6) to dismiss for failure to state a claim. *See* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1367 (1990); see also *St. Paul Insurance Company of Bellaire, Texas v. AFIA Worldwide Insurance Company*, 937 F.2d 274, 279 (5th Cir. 1991).

B.  The Breach of Tariff Claim

Hypercube argues that Excel, by accepting its services, "has agreed and is required by law to pay Plaintiffs the tariffed rates for the services provided." Complaint ¶ 33. Excel now argues that Hypercube has no tariff. Motion at 7. Both parties agree that the tariff Hypercube relies on does not technically include Hypercube. *Id.*; Response at 6-7. The companies included on the tariff Hypercube cites are: KMC Telecom, LLC, KMC Telecom II, LLC, KMC Telecom IV, Inc., KMC Telecom V, Inc., and KMC Telecom Data, LLC. Hypercube was formerly known as KMC Data, LLC. Motion at 7. Neither the present name, Hypercube Telecom, LLC, nor the former name, KMC Data, LLC, appears on this list. *Id.* The plaintiffs assert that the name KMC Data, LLC was erroneously omitted. Response at 6-7. They contend that the tariff should not have included the name KMC Telecom Data, LLC -- which does not exist -- and should have included the name KMC Data, LLC. Response at 7. Hypercube argues that the omission of KMC Data, LLC was a mere typographical error, and that it should not keep Hypercube from receiving the fees it earned.

The court agrees with Hypercube. As the plaintiffs put it, "Hypercube's failure to identify and correct this misnomer is a minor, ministerial issue that does not negate application of the tariff." Response at 8. Although both parties spend a great deal of time arguing over a handful of cases that they view as relevant, the court's own review of those cases has led it to conclude that none of them addresses a situation where there is an accidental omission or typographical error in a tariff. Excel cites the "filed rate doctrine," which requires that any regulated entity charge only the rates that are properly filed with the appropriate regulatory authority but precludes a court from determining what the regulatory body would have deemed to be a reasonable rate. *Occidental Chemical Corporation v. Louisiana Public Service Commission*, 494 F.Supp.2d 401, 417-18 (M.D. La. 2007). This doctrine in no way suggests that a typographical error in a tariff invalidates the tariff entirely. The other cases on which Excel relies deal with the requirement that when an entity changes its name, it must, as the newly-named entity, adopt the tariff of the old entity, or the tariff does not cover it. *MacLeod v. Interstate Commerce Commission*, 54 F.3d 888, 890 (D.C. Cir. 1995); *In re Americana Expressways, Inc.*, 133 F.3d 752, 757-58 (10th Cir. 1997) (holding that where an entity filed for bankruptcy and became a debtor in possession, the company's status was altered to such an extent that it must adopt the tariff of the "old" entity). While these cases may suggest that Excel need not pay any fees incurred after Hypercube changed its name from KMC Data, LLC to Hypercube

Telecom, LLC, they certainly do not hold that a typographical error in a tariff invalidates that tariff. In short, neither the cases cited by the parties, nor those found by the court in its own research, so hold.

Furthermore, the court notes that Excel did not discover the error in Hypercube's tariff until it "researched tariffs after the dispute escalated." Excel's Reply in Support of its Motion for Partial Judgment on the Pleadings at 4. In other words, Excel was fully aware of Hypercube's existence and the fees it was charging Excel. Thus, Excel cannot claim that it suffered any injustice as a result of Hypercube's failure to catch this omission. Excel is not entitled to partial judgment on the pleadings as a result of the accidental inclusion of the word "Telecom" in Hypercube's tariff.

Excel also argues, however, that Hypercube's tariff was ineffectual as of the date it took on the name Hypercube. Under 47 C.F.R. § 61.171, when a carrier changes its name or when its operating control is transferred from one carrier to another, whether in whole or in part, "the successor carrier must file tariff revisions to reflect the name change." The regulation indicates that this revision should take place "immediately." *Id.* Here, Hypercube states that it "acquired control of KMC Data LLC effective March 3, 2006." Response at 6. Thus, under the regulations, Hypercube was required to alter KMC Data LLC's tariff to reflect that change.

- 7 -

Hypercube could either have reissued the tariff in its own name, or filed notice with the FCC that it was adopting KMC Data LLC's tariff. Hypercube did neither.

The question, then, is whether that failure to adopt KMC Data LLC's tariff renders the tariff invalid. The court concludes that it does. In *MacLeod*, a transportation company had changed its name. Under 49 C.F.R. § 1312.15(a) -- formerly 49 C.F.R. § 1312.20(b)(i) -- a regulation of the Transportation Code that is highly analogous to 47 C.F.R. § 61.171, the newly-named company is treated as a new entity, which must adopt the tariffs of the old entity. *MacLeod*, 54 F.3d at 890. The court held that failure to follow this regulation means that the tariff has no association with the new entity and is therefore invalid. *Id. Americana Expressways* is similar. There, the transportation company filed for Chapter 11 bankruptcy. *Americana Expressways*, 133 F.3d at 753. The court ruled that when the company "became a debtor in possession, it became a fiduciary that assumed 'possession and control'" of its property and thus, under 49 C.F.R. § 1312.20, was required to amend or adopt the old rates. *Id.* at 757. Failure to do so meant that the plaintiff could not sue upon the invalid tariff. *Id.* at 758. Although both these cases deal with the Transportation Code rather than the Communication Code, 49 C.F.R. § 1312.15 is very similar to 47 C.F.R. § 61.171. The court finds the reasoning in *MacLeod* and *Americana Expressways* persuasive. Since March 3, 2006, when Hypercube acquired control of KMC Data, LLC, Hypercube has been relying on another entity's tariff. As

*MacLeod* and *Americana Expressways* hold, Hypercube cannot file suit on a tariff that does not belong to it.

In a separate motion, Hypercube sought to supplement the evidence in support of its response to the instant motion by providing the court with an updated version of its tariff. The court granted that motion but withheld decision on the impact of the new tariff until ruling on this motion. The new tariff reveals that, as of March, 2009, Hypercube's tariff accurately reflects the company's full name. Thus, as of March 31, 2009, Hypercube had a valid tariff and was no longer relying on KMC Data, LLC's tariff. Hypercube cites no authority, however, suggesting that this revision can operate retroactively. From March 3, 2006 until March 31, 2009, Hypercube was relying on an invalid tariff, upon which it cannot file suit. To the extent Hypercube seeks to recover fees incurred between those dates via the KMC Data, LLC tariff, it cannot -- as a matter of law -- do so.

### C.  Is Excel Obligated to Purchase Hypercube's Services?

Excel next argues it is entitled to judgment on the pleadings on Hypercube's declaratory judgment action. Motion at 10. Hypercube's declaratory judgment action asserts that the plaintiffs are entitled to a determination that the plaintiffs have lawfully charged Excel, and that Excel has breached the express contract between Hypercube and Excel by refusing to pay interstate access charges set forth in Hypercube's tariffs. Complaint ¶ 52. Excel, on the other hand, argues that it is

entitled to judgment on the pleadings on this claim because it was not obligated to purchase Hypercube's services and because Excel never affirmatively or constructively ordered Hypercube's services.  Motion at 10.  First, as the court has already held, Hypercube had no valid tariff between March 3, 2006 and March 31, 2009.  Thus, Excel's motion for judgment on the pleadings as to Hypercube's declaratory judgment action is granted to the extent Hypercube seeks to recover for any fees incurred between those dates.  To the extent Hypercube seeks to recover for fees incurred outside those dates, the court must examine whether, as Hypercube contends, the law required Excel to purchase Hypercube's services.

1. *Do the FCC's Orders Require Excel to Purchase Hypercube's Services?*

Under 47 U.S.C. § 201(a), "every common carrier engaged in interstate or foreign communication by wire or radio [must] furnish such communication service upon reasonable request therefor."  Further, where the FCC finds it necessary, it may require carriers to establish physical connections with each other or to establish "through routes."  47 U.S.C. § 201(a).  In other words, the FCC may require certain carriers to purchase the services of another carrier if it finds that such a requirement is necessary or would benefit the public.  *Id.*  However, a carrier is not obligated to purchase access services from LECs unless the FCC first compels it to do so.  *AT&T Corporation v. Federal Communications Commission*, 292 F.3d 808, 812 (D.C. Cir. 2002).  Here, Hypercube argues that the FCC has ordered entities such as Excel to buy the

services of entities such as Hypercube.  Hypercube cites *In the Matter of Access Charge Reform*, 16 F.C.C.Rcd. 9923 (April 27, 2001) (hereinafter referred to as "the Seventh Report and Order") and *In the Matter of Access Charge Reform*, 19 F.C.C.Rcd. 9108 (May 18, 2004) (hereinafter referred to as "the Eighth Report and Order") in support of its argument that the FCC has established a through route forcing IXCs like Excel to purchase the services of LECs such as Hypercube.

The FCC issued the Seventh Report and Order and Eighth Report and Order in an effort to level the playing field between two types of LECs: incumbent LECs ("ILECs") and competitive LECs ("CLECs").  16 F.C.C.Rcd. 9923 ¶¶ 1-7; 19 F.C.C.Rcd. 9108 ¶ 1.  In the Seventh Report and Order, the FCC recognized that CLECs were charging much higher rates than the ILECs and required the CLECs to gradually decrease those rates over time.  16 F.C.C.Rcd. 9923 ¶¶ 3-4.  The FCC also recognized that because IXCs were frustrated by CLECs' higher rates, many IXCs were refusing to pay for services provided by CLECs.  *Id.* ¶ 23.  "Additionally, [some] IXCs have threatened to stop delivering traffic to, or accepting it from, certain CLECs that they view as over-priced." *Id.* ¶ 24.  The FCC feared that if an IXC refused "to do business with a CLEC, it [would] become impossible for that CLEC's end users to reach, or receive calls from, some parties outside of the local calling area." *Id.*  To prevent this problem, the FCC declared that "an IXC that refuses to provide service to an end user of a CLEC charging rates within the safe harbor, while serving the

customers of other LECs within the same geographic area, would violate [47 U.S.C.] section 201(a)." *Id.* ¶ 94.

Excel interprets the language of the Seventh Report and Order to mean only that IXCs cannot refuse to provide service to the *end user*, or customer, of a CLEC. Motion at 15-16. In other words, Excel argues that the Seventh Report and Order only requires an IXC to accept the services of a CLEC if that CLEC is the direct link between the customer and the IXC. *Id.* at 16. Excel reasons that it would be unreasonable to require an IXC to accept services of an intermediary LEC because "there may or may not be a valid engineering reason for one or more 'intermediary' LECs to be involved in transporting the call between the network of the originating carrier serving the end user and the IXC." *Id.* Excel posits an infinite chain of LECs, most of which are unnecessary, and all of which Excel is required to pay.

Hypercube, on the other hand, argues that the "end user" requirement is nonexistent. Response at 16-18. The court agrees. Excel cites paragraph 94 of the Seventh Report and Order for the proposition that a CLEC must be in a direct relationship with a customer before the FCC forbids an IXC to refuse that CLEC service. Excel infers all this from the phrase "end user of a CLEC." Only two paragraphs later, however, the FCC repeats itself, stating "Above, we conclude that it would be a violation of section 201(a) for an IXC to refuse CLEC access service, either terminating or originating, where the CLEC has tariffed access rates within our

safe harbor and, in the case of originating access, where the IXC is already providing service to other members in the same geographical area." 16 F.C.C.R. ¶ 96. Notably absent is the mention of any requirement that the CLEC be non-intermediary.

Moreover, the Eighth Report and Order, which expands upon and clarifies the Seventh Report and Order, specifically addresses intermediate CLECs such as Hypercube. 19 F.C.C.Rcd. 9108 ¶¶ 17-18. The Eighth Report and Order recognizes that there has been great dispute about "the rates charged by competitive LECs when they act as intermediate carriers." *Id.* ¶ 17. The FCC found that often "an IXC may have no choice but to accept traffic from an intermediate competitive LEC chosen by the originating or terminating carrier and it is necessary to constrain the ability of competitive LECs to exercise this monopoly power." *Id.* Thus, the FCC adopted a new rule to address the situation: where the CLEC is performing as an intermediate carrier, it is not entitled to the full benchmark rate, but is entitled to tariff a rate that is the same as that "charged by the competing incumbent LEC for the same function." *Id.*

This language makes clear that the FCC has considered the relationship between IXCs and intermediate LECs -- the very relationship at issue here -- and believes that the intermediate LECs must be compensated for their service. Whatever minor confusion paragraph 94 of the Seventh Report and Order caused over whether the FCC requires IXCs to pay intermediary LECs, it has since been dispelled. The

court therefore finds that the FCC requires IXCs to purchase the services of an entity such as Hypercube, so long as the other requirements -- that the rates are within the safe harbor, and the IXC is already serving other LECs in the geographical area -- are met.  16 F.C.C.Rcd. 9923 ¶ 94.

The court does, however, agree with Excel's argument that there could theoretically be an infinite number of unnecessary intermediate LECs demanding payment from IXCs.  The FCC surely did not intend to require IXCs to pay LECs who are merely profiting from the FCC's rulings.  As the FCC noted in the Seventh Report and Order, the purpose of requiring IXCs to purchase the services of LECs such as Hypercube is to protect "the ubiquity and seamlessness of the nation's telecommunications network."  16 F.C.C.Rcd. 9923 ¶ 24.  Thus, where a CLEC is irrelevant to the ubiquity and seamlessness of the nation's telecommunications network, the IXC need not purchase its services.  Although the FCC has not clearly stated as much, it is implicit in the purpose of the Seventh Report and Order and Eighth Report and Order.  Thus, the court does not here rule that Excel must pay Hypercube the fees it demands.  Although the FCC has ruled that entities like Excel must pay entities like Hypercube, this requirement is enforceable only so long as Hypercube adds value to the telecommunications network.  In other words, if removing Hypercube from the chain of carriers would not disturb the flow of a customer's call, Excel is not required to purchase its services.  A company that

provides no additional value to anyone may not unnecessarily insert itself into a chain of carriers and take advantage of the FCC's decision that IXCs must pay LECs.

The parties have not briefed the issue of whether Hypercube serves any purpose in maintaining the "ubiquity and seamlessness of the nation's telecommunications network."  The court will therefore not address the issue here.  The court today holds only that the FCC requires IXCs like Excel to pay intermediate CLECs such as Hypercube, so long as that CLEC adds value to the nation's telecommunications network.

### 2.  *Has Excel Constructively Ordered Hypercube's Services?*

Even if Excel is not required to pay Hypercube pursuant to the FCC's orders, the parties agree that if Excel constructively ordered service from Hypercube, it is obligated to pay for that service.  Both parties agree that a party makes a constructive request for service if the receiver of services "(1) is interconnected in such a manner that it can expect to receive access services; (2) fails to take reasonable steps to prevent the receipt of access services; and (3) does in fact receive such services." *Advamtel, LLC v. AT&T Corporation*, 118 F.Supp.2d 680, 687 (E.D. Va. 2000).  The parties disagree over whether Excel took reasonable steps to prevent the receipt of Hypercube's services.  As discussed above, however, unless Hypercube provides no additional value to the telecommunications network, Excel *cannot* refuse Hypercube's services.  Thus, unless the court later concludes that Hypercube adds no value to the

telecommunications network, the issue of whether Excel constructively ordered Hypercube's services is moot. The court will therefore reserve decision on this question until such time as it becomes necessary to decide it.

### III. CONCLUSION

For the reasons discussed above, Excel's motion for partial judgment on the pleadings is **DENIED** in part and **GRANTED** in part. The court grants the motion for judgment on the breach of tariff claim to the extent that Hypercube seeks to recover fees incurred under the KMC Data, LLC tariff between March 3, 2006 and March 31, 2009. The motion is denied to the extent Excel sought judgment on the breach of tariff claim as a result of the typographical error in the tariff. As to the motion for judgment on the declaratory judgment action, the court declines to rule on this portion of the motion until the parties address whether Hypercube's services are relevant to the "ubiquity and seamlessness of the nation's telecommunications network."

**SO ORDERED**.

September 25, 2009.

_____
**A. JOE FISH
Senior United States District Judge**